## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**RASHARI N'ZINGA SHARP**,

Plaintiff,

v.

**THOMAS J. VILSACK, SECRETARY OF THE UNITED STATES DEPARTMENT OF AGRICULTURE, et al.**,

Defendants.

Case No. 1:19-cv-2393 (TNM)

## <u>MEMORANDUM OPINION</u>

Rashari Sharp claims, *pro se*, that her co-workers and supervisors at the U.S. Department of Agriculture discriminated against her because of her disability, then retaliated when she reported that discrimination. All this, Sharp claims, created a hostile work environment that led to her constructive discharge. The Court has already dismissed several counts of Sharp's Second Amended Complaint. *See* Mem. Order 11,[1] ECF No. 52. The Department and the Secretary of Agriculture (collectively, "the Secretary") now move for summary judgment on all remaining counts. There is no genuine dispute over any material fact and the Secretary is entitled to judgment as a matter of law. So the Court will grant his motion and dismiss the Second Amended Complaint with prejudice.

## I.

From 2015 to 2018, Sharp worked as an entry-level Budget Technician in the Budget Branch of the Department's Rural Development Program. Defs.' Statement of Undisputed

---

[1] The Court's page number references correspond to the pagination automatically generated by the CM/ECF system.

Mat.'l Facts ("SMF") ¶ 1, ECF No. 68-2.  The Branch Chief, Melissa Gutridge, hired Sharp and

eventually promoted her from a GS-5 level employee to GS-7.  *Id.* ¶ 2.  Sharp had three

supervisors during her time at the Department: (1) Gutridge, who always served as Sharp's first-

level supervisor except when Gutridge was detailed to another component between November

2017 and March 2018; (2) J.W. Wohlever, who filled in as Sharp's first-level supervisor during

Gutridge's detail; and (3) Leslie Barrack, who always served as Sharp's second-level supervisor.

*Id.* ¶¶ 3–5; *see also* Defs.' Ex. A at 2 ¶ 7, ECF No. 68-4.  When Sharp joined the Department,

none of these supervisors knew that she had a disability.  Nor did they perceive her as having a

disability.  SMF ¶¶ 10–16.

As a Budget Technician, Sharp had three major responsibilities: (1) organizing hardcopy

folders of old and current budget allotments; (2) validating these files and posting them to

SharePoint; and (3) accounting for all Rural Development program obligations for the previous

fiscal year, down to the state level.  *Id.* ¶¶ 19–20, 21–23.  The first two responsibilities ensured

analysts and accountants had ready access to allotments.  *Id.* ¶¶ 20, 22.  And the last one helped

the Department complete the presidential budget process.  *Id.* ¶ 23.

The time Sharp spent on these responsibilities ebbed and flowed throughout the year

depending on the Department's needs.  At the beginning of the year, for example, Sharp filed

many allotments.  *Id.* ¶ 26.  But when the presidential budget process ramped up in the fall,

Sharp shifted gears and spent more time accounting for Rural Development program obligations.

*Id.* ¶¶ 27–28.  As Sharp gained experience, Gutridge urged her to assume more responsibilities

so that she could eventually become a Budget Analyst.  *Id.* ¶¶ 29, 32.

Sharp claims, however, that continuous discriminatory harassment impeded her success.

Six incidents prefaced her contact with the Equal Employment Opportunity Commission.

*First*, Sharp lacked a desk phone for several months after she joined the Department. *Id.* ¶¶ 38, 40–41. Sharp "takes issue" with this onboarding frustration. Pl.'s Mem. in Opp'n to Defs.' Mot. Summ. J. ("Pl.'s Mem.") 7, ECF No. 73. But she does not dispute that a temporary halt in the procurement process caused the delay. SMF ¶¶ 39–41. And she concedes that another employee experienced a similar delay. *Id.* ¶ 43.

*Second*, the Department issued Sharp a LincPass keycard in January 2016 that did not function properly until two months later. *Id.* ¶¶ 44, 47. Sharp "surmise[s]" that the Department singled her out to receive a faulty keycard. Pl.'s Mem. 7. But she does not dispute that Gutridge advocated several times for Sharp's LincPass to be fixed. SMF ¶ 45. And she agrees the issues were resolved a few months later. *Id.* ¶ 47. The record contains no other evidence on the reasons for Sharp's faulty keycard.

*Third*, Sharp claims that Budget Analysts subjected her to a "discriminatory hostile work environment" when they "misfiled the folders" for which she was responsible. Pl.'s Mem. 10–11. But Sharp testified that she did not have "any sense at all" why these incidents occurred. SMF ¶ 52. Nor does she dispute that Gutridge responded to these incidents by locking the allotment folders and instructing analysts to request them going forward. *Id.* ¶¶ 50–51.

*Fourth*, Sharp claims that Budget Analysts often sent her allotments with errors, which she had to send back for corrections. Pl.'s Mem. 18–19. She believes this back-and-forth process created "tension" with her coworkers, SMF ¶ 55, because they pestered her with their "complete lack of attention" and "deliberate recklessness," Pl.'s Mem. 20. But Sharp agrees that office procedures required her to request corrections so that the analysts "could learn how to send allotments to [her] the right way." SMF ¶¶ 53–54. And she agrees these incidents usually elicited "no more than a professional apology" from the analysts. *Id.* ¶ 56.

The one exception appears to be an incident that occurred in 2015 between Sharp and Budget Analyst Kaeren Parker.  *Id.* ¶ 66.  Sharp says Parker "yell[ed] at her" after Sharp informed her of a mistake on one of her allotments.  Pl.'s Mem. 27–28.  Sharp concedes, however, that Gutridge spoke to her and Parker after the incident.  And Sharp agrees Parker told her she would treat her with "respect and honesty" moving forward.  SMF ¶ 69.

*Fifth*, Sharp "saw mold on one of the files" she had to handle.  *Id.* ¶ 57.  Though she initially asked Gutridge for some gloves, she later told Gutridge that she planned to get them herself.  *Id.* ¶¶ 58–59.  Sharp made several more requests for gloves throughout her employment.  *Id.* ¶¶ 60–65.  And the Department always obliged these requests, unless Sharp alerted her supervisors that she had gotten gloves herself.  *Id.*

*Sixth*, Sharp received her first performance evaluation at the end of the 2016 fiscal year.  *Id.* ¶ 73.  In that review, Gutridge gave Sharp an "Exceeds" rating in three of the four performance categories.  *Id.* ¶ 74.  For customer service, however, Gutridge only rated her "Fully Successful."  *Id.*

No one at the Department knew Sharp had a disability when these incidents occurred.  Nor did anyone perceive Sharp as having a disability during this time.  *Id.* ¶¶ 11–16.  At her deposition, Sharp testified that any bullying by her co-workers "didn't have anything to do with [her] disability."  *Id.* ¶ 17.  Sharp instead believed the bullying occurred because she was quiet, and her colleagues perceived her quietness as rudeness.  *Id.* ¶ 18.  As for her supervisors, none knew Sharp had any disability—or perceived her as having one—until they became involved in Sharp's EEO complaint process.  *Id.* ¶¶ 11, 13, 15.

Sharp began the EEO complaint process on the heels of her less-than-perfect performance review.  She contacted an EEO counselor for the first time on November 17, 2016.  *Id.* ¶ 6.  And

she filed her first formal complaint of discrimination the following February.  *Id.*  She alleged the Department "subjected her to discrimination based upon her disability" when Gutridge gave her a "Fully Successful" rating instead of an "Exceeds" rating on her customer service metric. Defs.' Ex. F at 5, ECF No. 68-9.  An EEO investigator then followed up with Gutridge, who then learned—for the first time—that Sharp had "a physical disability (allergy to mold)" and a "mental disability (traumatic brain injury)."  Defs.' Ex. E at 6, ECF No. 68-8; *see also* SMF ¶ 11. Sharp's second-level supervisor, Barrack, similarly learned of Sharp's disability when she became involved in Sharp's EEO complaint process, although she "never learned what her disability was."  SMF ¶ 13.  And Sharp's only other first-line supervisor, Wohlever, learned of Sharp's disability in May 2018 when he became involved in her EEO activity, although he too lacked knowledge of her exact disability.  *Id.* ¶ 15; Defs.' Ex. G at 156, ECF No. 68-10.  So all agree the earliest any supervisor knew of Sharp's disability was November 17, 2016, when Sharp initiated her EEO proceedings.  *See* SMF ¶¶ 11–15.

Sharp used all her annual leave shortly after she filed her first formal EEO complaint.  In April 2017, Sharp had accrued 95 hours of leave, with an expected year-end balance of 171 hours.  *Id.* ¶ 96.  By August, however, Sharp had zeroed out this balance.  *Id.*  Sharp often took leave on an ad hoc basis but never complied with the Department's unexpected leave policy.  *Id.* ¶¶ 92, 93.  The policy required employees to call their supervisor "within 1 hour of [their] start time the morning of the request."  *Id.* ¶ 84; *see also id.* ¶ 92.  Yet Sharp sent emails or had another individual request leave on her behalf.  *Id.* ¶ 93.

When Sharp's annual leave started running low in July 2017, she sought leave under the Family and Medical Leave Act.  *Id.* ¶ 101.  Sharp submitted her FMLA request to Gutridge in hardcopy form.  *Id.*  But because Sharp's component was in the middle of moving to a new

office space, Gutridge took the form to the new office.  *Id.*  Upon arrival, Gutridge scanned the

form and emailed it to Jeryl McDowell, a Labor Relations Specialist.  *Id.* ¶¶ 98, 103.  Gutridge

sent the form to McDowell because Sharp failed to do so herself and had not reported to work for

more than two weeks after giving Gutridge the form.  *Id.* ¶ 104.  Gutridge did not send Sharp's

FMLA paperwork to anybody else.  *Id.* ¶ 105.

When Gutridge reviewed the form, she found the physician's handwriting illegible and

saw what appeared to be two people's handwriting.  *Id.* ¶ 106.  To correct these deficiencies,

Gutridge asked Sharp to have her physician redo the paperwork.  Sharp refused.  So McDowell

called Sharp's physician, who clarified that Sharp would need between 1–2 days per month and

1–2 days per week of leave without pay.  *Id.* ¶ 107.  In September 2017, Gutridge approved

Sharp's request.  And Gutridge told her via email that she could take leave on the terms her

physician recommended.  *Id.* ¶ 108.  Gutridge also gave Sharp FMLA leave for the entire two-

week period Sharp was absent after submitting her FMLA paperwork.  *Id.* ¶ 110.

A month after Sharp obtained FMLA approval, she requested a reasonable

accommodation.  *Id.* ¶ 112.  She specifically sought permission to "(1) use 'ad hoc telework in

lieu of [taking] sick leave or FMLA,' (2) have 'another individual beside[] [herself] call in when

she would be out of the office for the day,' and (3) have protective gloves for filing allotments

and other paperwork."  *Id.*  When McDowell asked Sharp to verify her accommodation request,

she directed him to her FMLA paperwork.  *Id.* ¶ 114.  But that form just had the word "telework"

written under the prompt stating, "Estimate the part-time or reduced work schedule the employee

needs, if any."  *Id.*  Sharp testified that she inserted the word "telework" because her physician

told her to do so.  *Id.* ¶ 116.  But the paperwork offered no details on the conditions, frequency,

or extent of the "telework" Sharp required.  *Id.* ¶ 117.

In December 2017, Gutridge denied Sharp's request for ad hoc telework in lieu of sick leave or FMLA leave.  *Id.* ¶ 119.  She told Sharp that sick leave, annual leave, and FMLA leave are reserved for circumstances when an employee is incapacitated and cannot perform her normal job functions.  *Id.* ¶ 120.  In contrast, Gutridge explained, telework is available for an employee who is still able to work but from another location.  *Id.*  Because telework and leave are mutually exclusive—not substitutes—Gutridge denied the request.  Gutridge also denied Sharp's request to have a third-party ask for leave on her behalf.  *Id.* ¶ 121.  Gutridge said the call-in requirement ensures that the absent employee "communicate[s] with a supervisor to explain the status of any assignments."  *Id.* ¶ 122.  This made sure any "assignments [would] be covered" while the employee is out.  *Id.*  Finally, Gutridge approved Sharp's request for gloves, noting the office gave her gloves the previous month.  *Id.* ¶ 123.

Around this same time, Sharp launched a second EEO proceeding and filed her second EEO complaint.  *Id.* ¶ 7.  This new complaint alleged discrimination and retaliation because of her disability, perceived disability, sex, and prior EEO activity.  *Id.* ¶ 8.  By March 2018, Plaintiff had exhausted her FMLA leave.  *Id.* ¶ 165.  That same month, Sharp requested a light-duty "work restriction" to accommodate a surgery on her left wrist.  *Id.* ¶¶ 149–50.  Gutridge then tasked interns to take over many of Sharp's repetitive tasks like stapling and hole-punching. *Id.* ¶¶ 150, 154.  This workflow setup continued until Sharp resigned in 2018.  *Id.* ¶ 154.

Sharp previewed her resignation in an email in June 2018.  *Id.* ¶ 161.  In the email, Sharp told Gutridge and several other employees that she was leaving the Department to return to school and focus on her individually-owned business.  *Id.*  Sharp then emailed Human Resources saying that her effective end-date would be July 20, 2018.  *Id.*  But on July 17, Sharp emailed several employees stating that "her resignation is effective immediately," and that she would not

be coming back to work.  *Id.* ¶ 163.  Sharp cited "unrelenting offenses" as the reason for her

abrupt departure.  *Id.* ¶ 164.  Yet she did not describe any specific offenses.

After Sharp resigned, the EEOC issued a decision on Sharp's two pending EEO

complaints, concluding no discrimination or harassment had occurred.  *Id.* ¶ 9.  Then Sharp filed

this suit in August 2019, claiming her co-workers and supervisors discriminated and retaliated

against her because of her disability.[2]  *See* Initial Compl., ECF No. 1.  When Sharp filed her

Second Amended Complaint, the Secretary moved for partial dismissal and partial summary

judgment.  *See* Defs.' Mot. Partial Dismissal & Partial Summ. J., ECF No. 57.  Acting on that

motion, the Court dismissed Counts II, III, and VI.  *See* Mem. Order 11.

Four counts remain: (1) hostile work environment (Count I), Second Am. Compl.

("Compl.") 2, ECF No. 46-1; (2) retaliation based on the public disclosure of her private medical

information (Count IV), *id.* at 15–21; (3) retaliation based on "miscellaneous acts of harm"

(Count V), *id.* at 21–27; and (4) constructive discharge (Count VII), *id.* at 33.  The Secretary now

moves for summary judgment on these remaining counts.  *See* Defs.' Mot. Summ. J., ECF No.

---

[2] In the Complaint, Sharp alleges the Secretary discriminated against her on several bases, such as attention deficit disorder, mold allergy, concussion/traumatic brain injury, perceived disability, perceived gender/sex, anxiety/post-traumatic stress disorder, bipolar disorder, major depressive disorder, persistent depressive disorder, panic attacks, Hashimoto's autoimmune disorder/chronic lymphocytic thyroiditis, microadernoma/pituitary gland tumor on the brain, and prior EEO activities.  *See* Cover of Second Am. Compl. 5, ECF No. 46.  But the undisputed record supports only two possible disabilities: Sharp's mold allergy and her traumatic brain injury.  Defs.' Ex. E at 6, ECF No. 68-8.  Sharp also refused to provide medical releases to the Secretary authorizing him to depose her treating physicians.  SMF at ¶ 165.  So the Court barred Sharp from "introduc[ing] any evidence from those treating physicians or any documents signed by them in summary judgment or trial." *Id.*; *cf.* Fed. R. Civ. P. 37(b)(2)(A)–(B) ("If a party fails to comply with [a discovery] order requiring it to produce another person for examination, the court may . . . prohibit the disobedient party . . . from introducing designated matters in evidence[.]").

68.  His motion is ripe, and the Court has jurisdiction to adjudicate it.  *See* 28 U.S.C. § 1331.  For

the reasons stated below, the Court will grant the motion.

## II.

A party may move for summary judgment when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

To establish a fact as undisputed, a party may rely on "materials in the record, including

depositions, documents, . . . affidavits or declarations."  *Id.* 56(c)(1)(A).  A fact is "material" for

purposes of summary judgment if it "might affect the outcome of the suit under the governing

law."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if the

"evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Hayes

v. District of Columbia*, 923 F. Supp. 2d 44, 48 (D.D.C. 2013).  Once the movant carries its

burden, the non-moving party must provide "specific facts showing that there is a genuine issue

for trial."  *Anderson*, 477 U.S. at 250.

The Court liberally construes Sharp's pleadings because she is *pro se*.  *Moini v.

Wrighton*, 602 F. Supp. 3d 162, 171 (D.D.C. 2022).  But liberal construction is not a "license to

ignore the Federal Rules of Civil Procedure."  *Oviedo v. Wash. Metro. Area Transit Auth.*, 948

F.3d 386, 397 (D.C. Cir. 2020) (cleaned up).  Rule 56(e) authorizes courts to consider facts

undisputed for the purpose of summary judgment "[i]f a party fails to properly support an

assertion of fact or fails to properly address another party's assertion of fact."  Fed. R. Civ. P.

56(e)(2).  And the Local Rules clarify the proper way to dispute a fact on summary judgment:

the opposition must "be accompanied by a *separate concise statement of genuine issues* setting

forth all material facts as to which it is contended there exists a genuine issue necessary to be

litigated, which shall include references to the parts of the record relied on to support the

statement." D.D.C. LCvR 7(h)(1) (emphasis added). When a party fails to dispute facts in a separate statement, "the Court may assume that facts identified by the moving party in its statement of material facts are admitted." *Id.*

This rule applies equally to *pro se* litigants. In *Oveido*, for example, a *pro se* litigant opposed his employer's motion for summary judgment. 948 F.3d at 397. But the employee failed "to provide support in the record for his memorandum's allegations." *Id.* This led the D.C. Circuit to conclude the district court acted "perfectly within its authority" to consider the employer's statement of facts "undisputed for purposes of the motion." *Id.* So too here.

At the outset of this litigation, the Court warned Sharp of her obligation under Local Rule 7(h) in a Standing Order tailormade for *pro se* litigants. *See* Standing Order § 14(B), ECF No. 4. It specifically told Sharp she would have to "submit a statement enumerating all material facts which [she] contends are genuinely disputed." *Id.* § 14(B)(i). And it reminded her of the consequence of failing to file such a statement, warning her that "[t]he Court may assume that facts identified by the moving party in its statement of material facts are **admitted**, unless such facts are controverted in the statement filed in opposition to the motion." *Id.* § 14(B)(v) (emphasis in original). Despite these warnings, Sharp did not file a counterstatement of disputed material facts.[3] Because she deserves no further warnings, the Court finds undisputed all the facts in the Secretary's statement of material facts. *See Oveido*, 948 F.3d at 397–98.

---

[3] Sharp's opposition memorandum also exceeds this district's 45-page limit by 34 pages. *See* D.D.C. LCvR 7(e) (setting page limits); Pl.'s Mem. in Opp'n to Defs.' Mot. Summ. J., ECF No. 73. The Court admonishes Sharp for overrunning the page-limit requirement without any justification. Still, the Court has reviewed and considered all the arguments Sharp raised in her memorandum.

### III.

Sharp's remaining claims fall into three categories: (A) retaliation (Counts IV & V); (B) hostile work environment (Count I); and (C) constructive discharge (Count VI). The Court addresses each category in turn and concludes the Secretary is entitled to summary judgment on all claims.

### A.

Start with Sharp's two retaliation claims. One is based on the alleged disclosure of her private medical information (Count IV) and the other on "miscellaneous acts of harm" (Count V). Compl. 15–27. The legal authority for each of these claims is unclear. At the beginning of Count IV, Sharp invokes a panoply of federal laws: the Family and Medical Leave Act, the Privacy Act, the Rehabilitation Act, and the Health Insurance Portability and Accountability Act. *See id.* at 15. For Count V, Sharp invokes no authority. And neither the Complaint nor Sharp's summary judgment briefing links specific laws to specific facts.

The Court warned Sharp that she "will need to choose among the many, ambiguous theories of liability advanced in her Complaint and support them with competent evidence." Mem. Order 9. Sharp ignored this warning. Instead, she submitted a 75-page opposition with 45 subsections listing grievances disconnected from any theory of liability. *See generally* Pl.'s Mem. While the Court is mindful of Sharp's *pro se* status, she cannot expect this Court to sift through her pleadings and briefing "to decide what claims [she] may or may not want to assert." *Jarrell v. Tisch*, 656 F. Supp. 237, 239 (D.D.C. 1987).

This is especially true with her retaliation claims. Retaliation is not some federal common law claim. It is a theory of liability that must be textually traceable to a specific federal

law.  So the Court adopts the Secretary's convention of consolidating Sharp's retaliation claims and analyzing possible liability under each law she invokes.

### 1.

First up, the FMLA and HIPAA.  None of the facts Sharp mentions in her Complaint are actionable under either of these laws.  Sharp vaguely argues the Secretary violated the FMLA in the way he handled her request for FMLA leave.  *See* Pl.'s Mem. 35–44, 48–54, 62–74.  Though the FMLA generally "entitles eligible employees to take unpaid leave for family and medical reasons," it does not give Sharp a private right of action.  *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 160 (D.C. Cir. 2015).  The law classifies employees under either Title I or Title II. Title I covers "private sector and federal employees with less than 12 months of service." *Chandler v. Bernanke*, 531 F. Supp. 2d 193, 201 (D.D.C. 2008) (citing 29 U.S.C. §§ 2601 *et seq.*).  And Title II covers employees "with more than 12 months of service."  *Id.* (citing 5 U.S.C. §§ 6381 *et seq.*).

Title I grants employees a private right of action, but "Title II contains no analogous provision."  *Manga v. Carranza*, 18-cv-00437, 2020 WL 1451584, at *5 (D.D.C. Mar. 25, 2020) (citation omitted).  So employees covered by Title II lack a private right of action—a conclusion reached by every circuit court to consider the question.[4]  Because the parties agree that Sharp

---

[4] *See Mann v. Haigh*, 120 F.3d 34, 37 (4th Cir. 1997) ("Title II does not contain an express provision for a private right of action to enforce the leave rights there granted. . . . [And] no implied right of action to remedy violations of Title II exists either."); *Russell v. U.S. Dep't of the Army*, 191 F.3d 1016, 1018 (9th Cir. 1999) ("The absence of express statutory authorization for such suits under Title II would seem to bar [the plaintiff's] FMLA claims because it is axiomatic that suits against the government are barred by sovereign immunity absent an unequivocally expressed waiver."); *see also Cavicchi v. Sec'y of Treasury*, No. 04-10451, 2004 WL 4917357, at *6 (11th Cir. Oct. 15, 2004) ("We agree with [the Fourth and Ninth] circuits that the absence of an express authorization precludes [the appellant's] FMLA claim for retaliation[.]"); *Burg v. HHS*, 387 F. App'x 237, 240 (3d Cir. 2010) (same).

was a federal employee with more than 12 months of service when she submitted her FMLA request, she cannot sue under the FMLA.  SMF ¶¶ 1, 101.

Sharp runs into a similar roadblock with HIPAA.  She invokes this law, which "generally provides for confidentiality of medical records," *Acara v. Banks*, 470 F.3d 569, 571 (5th Cir. 2006), to bolster her complaints about the alleged mishandling of her FMLA form, *see* Pl.'s Mem. 53–54.  But HIPAA, like the FMLA, does not contain a private right of action.  And this conclusion enjoys a similar consensus among the circuits.  *See Hudes v. Aetna Life Ins. Co.*, 806 F. Supp. 2d 180, 195–96 (D.D.C. 2011) (collecting cases).

### 2.

Next, the Privacy Act.  Sharp seemingly alleges that the purported mishandling of her FMLA paperwork constitutes unlawful discrimination and retaliation under the Privacy Act.  *See* Compl. 15–21.  This law exposes the government to civil liability if a federal agency "fails to comply with any . . . provision of [the statute] . . . in such a way as to have an adverse effect on an individual."  5 U.S.C. § 552a(g)(1)(D).  To state a claim under this statute, Sharp must show "that (1) the agency violated a provision of the Act, (2) the violation was 'intentional or willful,' and (3) the violation had an 'adverse effect' on the plaintiff."  *Maydak v. United States*, 630 F.3d 166, 178 (D.C. Cir. 2010) (first quoting 5 U.S.C. § 552a(g)(4), then quoting 5 U.S.C. § 552a(g)(1)(D)).

Sharp's claim founders on the first element.  Only one set of facts in the Complaint might give rise to liability under the Privacy Act:  Gutridge's disclosure of Sharp's FMLA form to McDowell.  *See* Compl. 16–17.  But liability attaches only if the Department "violate[d] the Act" by "'disclos[ing]' information in the form of a 'record' from a 'system of records' and the disclosure [was] not pursuant to a valid exception under the Act."  *Chichakli v. Tillerson*, 882

F.3d 229, 233 (D.C. Cir. 2018) (quoting 5 U.S.C. § 552a(b)).  This means Gutridge's disclosure

was lawful because the Act's confidentiality requirement exempts disclosures to "employees of

the agency . . . who have a need for the record in the performance of their duties."  5 U.S.C.

§ 552a(b)(1).  The parties agree that McDowell is a Labor Relations Specialist at the

Department.  SMF ¶ 98.  And Sharp does not dispute that supervisors at the Department can send

FMLA forms to Labor Relations Specialists like McDowell if they have any questions.  *See*

Defs.' Ex. C at 2 ¶ 9, ECF No. 68-6.  Because Gutridge's disclosure to McDowell falls within an

exception to the Privacy Act's bar on certain disclosures, the Secretary is entitled to judgment on

this claim.[5]

**3.**

That leaves the Rehabilitation Act.  Unlike any of the previously discussed statutes, the

Rehabilitation Act makes it unlawful for an employer to retaliate against an employee for

reporting disability discrimination.  *See* 29 U.S.C. § 791(f) (incorporating the antiretaliation and

antidiscrimination provisions from the Americans with Disabilities Act, 42 U.S.C. § 12111 *et*

*seq.*); 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such

individual has opposed any act or practice made unlawful by this chapter or because such

individual made a charge, testified, assisted, or participated in any manner in an investigation,

---

[5] Sharp also alleges that Gutridge mishandled the form in the way she stored physical and electronic copies of it.  *See* Pl.'s Mem. 38–39.  But the undisputed facts show Gutridge shredded the hard copy and deleted the emails transferring it from the scanner to McDowell.  SMF ¶ 103. To the extent that Sharp tries to root a Privacy Act claim in *Gutridge*'s possession of the form, Gutridge is exempted just the same as McDowell.  Employees wanting FMLA leave must submit their request to their supervisors for approval, SMF ¶ 98, meaning Gutridge needed Sharp's form and maintained it "in the performance of [her] duties," 5 U.S.C. § 552a(b)(1).  More, Sharp fails to establish that any violation was "intentional or willful," *id.* § 552a(g)(4) and (g)(3), or that the violation had an "adverse effect" on her in the form of "actual damages," *id.* § 552a(g)(1)(D) and (g)(4)(A).

proceeding, or hearing under this chapter."); *id.* § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . [the] terms, conditions, and privileges of employment.").

The *McDonnell Douglas* burden-shifting framework applies to retaliation claims brought under the Rehabilitation Act, at least when those claims are grounded in circumstantial evidence. *See McIver v. Esper*, 456 F. Supp. 3d 174, 190 (D.D.C. 2020).  To prevail under this framework, Sharp must initially establish a prima facie case of retaliation by proving that "(1) she engaged in a protected activity, (2) [the Secretary] took a materially adverse action against her, and (3) there was a causal connection between the protected activity and the adverse action." *Congress v. District of Columbia*, 514 F. Supp. 3d 1, 16–17 (D.D.C. 2020) (citation omitted).  If she succeeds at this step, then the burden shifts to the Secretary to "come forward with a legitimate reason for the challenged action." *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019). And if the Secretary makes this showing, the Court must finally decide "whether [Sharp] produced sufficient evidence for a reasonable jury to find that [the Secretary's] asserted non-discriminatory reason was not the actual reason and that [he] intentionally discriminated against [Sharp] on a prohibited basis." *Id.* (citation omitted).

The Secretary prevails at step one of the *McDonnell Douglas* framework.  The Secretary concedes Sharp engaged in "protected activity" when she initiated EEO proceedings.  *See* SMF ¶ 6; 42 U.S.C. § 12203(a) (forbidding retaliation against individuals who "participated in any manner" in an EEO "proceeding"); *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) ("By filing a formal complaint of discrimination . . . Holcomb engaged in protected activity.").  But the Court finds that the Secretary never took any "materially adverse action" against Sharp.

*Congress*, 514 F. Supp. 3d at 16–17.  Nor has Sharp shown a "causal connection" between her protected activity and the actions she labels adverse.  *Id.*

An adverse action in the retaliation context "must be harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).  And "to prove the requisite causal connection, [Sharp] must show that the adverse action would not have occurred but for the protected activity."  *Congress*, 514 F. Supp. 3d at 17 (cleaned up).

Liberally construed, Sharp's Complaint leans on seven sets of facts to support her retaliation claim under the Rehabilitation Act:  (1) the Secretary's granting of Sharp's FMLA request under the terms her physician provided; (2) the Secretary's denial of her accommodation requests seeking ad-hoc telework rather than FMLA or sick leave and to have a third-party call to request leave on her behalf; (3) various time and attendance violations; (4) the Secretary's enforcement of his unexpected leave policy; (5) the Secretary's reassignment of certain duties to interns; (6) the Secretary's granting of Sharp's light duty request; and (7) Wohlever's alleged comment about hearing voices in his head.  The Court considers each incident in turn.  None can support a claim of unlawful retaliation.

*First*, Sharp appears to claim that the Secretary retaliated against her by denying her request for FMLA benefits, and, more specifically, by denying her request to "telework" under the FMLA.  *See* Compl. 15 ¶ 2, 17 ¶ 9.  Yet the undisputed record shows that the Secretary *granted* Sharp's request for FMLA leave under the terms her physician recommended.  SMF ¶¶ 107–08.  True, Sharp wrote the word "telework" on her FMLA form.  *Id.* ¶ 115.  But because the form did not explain the conditions, frequency, or extent of Sharp's "telework" request, *id.* ¶ 117, McDowell called Sharp's physician to seek clarification.  And he told McDowell that

16

Sharp would need between 1–2 days per month and 1–2 days per week of unpaid FMLA leave. *Id.* ¶ 107.  Gutridge then granted Sharp's request under these exact terms.  *Id.* ¶ 108.  No reasonable employee would consider this conduct "materially adverse," let alone an action causally connected to Sharp's EEO activity.  *Congress*, 514 F. Supp. 3d at 18.

*Second*, Sharp claims the Secretary retaliated against her when Gutridge denied her accommodation requests seeking ad-hoc telework in lieu of taking FMLA or sick leave and to have a third-party call in to ask for leave on her behalf.  *See* Compl. 20–21 ¶¶ 26–27; SMF ¶ 112. While the Rehabilitation Act requires employers to provide "reasonable accommodations" to employees with disabilities, the employee must be able to "perform the essential functions of her job" with the accommodation she requests.  *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999).  And the reasonable accommodation process is a two-way street, requiring the employee to engage in "a flexible give-and-take" so that the employer and employee can together "determine what accommodation would enable the employee to continue working." *Ward v. McDonald*, 762 F.3d 24, 31–32 (D.C. Cir. 2014) (cleaned up).  An employer will not be responsible for denying an accommodation request if the employee "cause[s] a breakdown in the process for the purpose of . . . inflicting liability."  *Id.* (cleaned up).

The Secretary argues he lawfully denied both of Sharp's requests.  The Court agrees.  On the teleworking request, Gutridge told Sharp that one of her "main duties [as a] Budget Technician [is] to file the Apportionments and Allotments in the appropriate folders."  Defs.' Ex. J. at 50, ECF No. 68-13; *see also* SMF ¶ 19 (describing this in-person task as one of Sharp's "major duties").  Since this task can "only be performed in the office," ad-hoc telework would "severely impact" the Department's operations because it would make critical documentation inaccessible without notice.  Defs.' Ex. J at 50.  Sharp never explained how she could perform

this essential task while working remotely on an ad-hoc basis.  And when McDowell asked

Sharp to substantiate her request, she just pointed him to her previously submitted FLMA form

that bore the word "telework."  SMF ¶ 114; *see Ward*, 762 F.3d at 31–32 ("[W]hen the need for

an accommodation is not obvious, an employer, before providing a reasonable accommodation,

may require that the individual with a disability provide documentation of the need for

accommodation." (citation omitted)).

But this form fails to explain how ad-hoc telework would permit Sharp to perform her

job's essential functions, which must be done in-person.  Nor does it explain how teleworking

could substitute for FMLA or sick leave, which only apply when an employee is incapacitated or

otherwise unable to perform her normal duties.  The Court therefore finds that the Secretary

lawfully denied Sharp's ad-hoc teleworking request because it was incompatible with her job's

essential functions.  And Sharp alone bears the blame for failing "to make reasonable efforts to

help [her employer] determine what *specific* accommodations are necessary."  *Ward*, 762 F.3d at

32 (citation omitted) (emphasis added).

The Court reaches a similar conclusion about Sharp's request to have a third-party ask for

unexpected leave on her behalf.  SMF ¶ 112.  Sharp concedes that one of her job's duties was

"[m]aintaining contact with [her] supervisor" to "plan, coordinate, and advise on work efforts."

*Id.* ¶ 24.  She also agrees that the Department's unexpected leave policy required an employee

taking unscheduled leave "to call and speak with the supervisor, their designee, or another leave

approving official within 1 hour of [her] start time the morning of the request and ask for the

number of hours and specific type of leave being requested."  *Id.* ¶ 84 (cleaned up).  Sharp does

not dispute that the call-in requirement ensures supervisors know the status of pending

assignments, which enables them to obtain coverage for absent employees.  *Id.* ¶ 122.  Yet Sharp

has never explained how this essential communication would occur if another person called in on her behalf.  In fact, Sharp had another person call in several times, in violation of the Department's policy, and this always left Gutridge stranded as to the status of Sharp's projects. *Id.* ¶¶ 132–33.  So the Court finds the Secretary lawfully denied this accommodation request.

One final observation on this set of facts:  Sharp has not shown how the denials of these requests—ad-hoc teleworking and third-party call-ins—are "materially adverse," an essential element of a retaliation claim under the Rehabilitation Act.  *See Congress*, 514 F. Supp. 3d at 16. And the Court finds that these actions would not have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68 (citation omitted).  In fact, Sharp herself filed a second EEO complaint just one month after Gutridge denied her accommodation requests.  SMF ¶¶ 7, 121.  The Secretary is therefore entitled to summary judgment on Sharp's retaliation claim to the extent it arises out of her denied accommodation requests.[6]

*Third*, Sharp lists a litany of time and attendance violations in her Complaint, all of which she chalks up to retaliation.  *See, e.g.*, Compl. 18–21 ¶¶ 13–14, 18–24; *id.* at 22 ¶ 1; *id.* at 24 ¶¶ 14–15; *id.* at 26 ¶ 24; *id.* at 27 ¶¶ 26–27.  The Secretary addressed each in his summary judgment memorandum, arguing the undisputed evidence shows that these leave requests were either not denied as alleged or were denied on account of legitimate, nondiscriminatory reasons. *See* Defs.' Mem. in Supp. of Mot. Summ. J. 26–28, ECF No. 68-1.  Sharp addressed only two of

---

[6] The Court also notes that Sharp requested an accommodation for gloves that she could wear when handling allotments.  SMF at ¶ 112.  But Gutridge granted this request and gave her gloves within a reasonable amount of time.  *Id.* ¶ 123; *Congress v. Gruenberg*, 643 F. Supp. 3d 203, 224 (D.D.C. 2022) ("[A] relatively short delay of a few weeks (or even a few months) in approving a request typically does not support a [reasonable accommodation] claim." (citation omitted)).  So no "materially adverse" action occurred. *Congress v. District of Columbia*, 514 F. Supp. 3d at 16.

these incidents—the ones on September 5 and 18, 2017—in her opposition.  Pl.'s Mem. 53–55.

So the Court only addresses these arguments and accepts as conceded the Secretary's arguments

related to the incidents on August 29 and November 17, 2017, and April 27, 2018.  *Hopkins v.*

*Women's Div., Gen. Bd. of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("[W]hen a

plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised

by the defendant, a court may treat those arguments that the plaintiff failed to address as

conceded."); *Brett v. Brennan*, 404 F. Supp. 3d 52, 59 (D.D.C. 2019) (same).

Sharp first claims she was marked AWOL on September 18, 2017, in retaliation for the

EEO complaint she filed seven months earlier.  Pl.'s Mem. 53; SMF ¶ 6.  But the undisputed

record shows the Department credited her time and attendance on that day.  SMF ¶ 130.  Sharp

also claims she was improperly given an AWOL charge on September 5, 2017, in retaliation for

her protected activity.  Pl.'s Mem. 55.  But Sharp does not dispute that she failed to call Gutridge

or another leave-approving officer to request time off that day, in violation of the Department's

unexpected leave policy.  SMF ¶ 129.

Sharp finally lodges the general complaint that she was marked AWOL as punishment

for engaging in protected activity.  Pl.'s Mem. 55.  The undisputed record, however, shows that

Sharp received repeated warnings—on August 22, August 23, September 8, October 2, and

December 28, 2017, and February 21, 2018—that she needed to follow the call-in requirement

outlined in the unexpected leave policy.  SMF ¶ 91.  The undisputed record also shows that

Sharp *never* complied with the unexpected leave policy when requesting leave or telework on the

day of her absence.  *Id.* ¶ 92.  Sharp's history of noncompliance, coupled with the seven-month

gap between her protected activity and AWOL charge on September 5, 2017, leads the Court to

conclude that the Department never marked Sharp down for time and attendance violations in

retaliation for her protected activity.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (citing with approval cases in which three- and four-month gaps could not establish causation).  No reasonable jury could find otherwise.

*Fourth*, Sharp claims, without any evidentiary support, that the Secretary enacted a "new" leave policy that required employees to call in one hour before their start time.  Compl. 15–16 ¶ 3.  But the unexpected leave policy had been in place since 2002, 13 years before Sharp joined the Department.  SMF ¶ 88.  Sharp's factually incorrect allegations are therefore unable to support any claim of retaliation.

*Fifth*, Sharp asserts that the Secretary retaliated against her when he hired two interns and assigned them to take over several of Sharp's tasks.  Compl. 21 ¶ 2.  But a reassignment of duties only constitutes a "materially adverse" employment action when it puts "the employee in a position with less responsibility and fewer opportunities for compensation and advancement, or results in the loss of supervisory responsibilities."  *Mamantov v. Jackson*, 898 F. Supp. 2d 121, 128–29 (D.D.C. 2012) (cleaned up).  Sharp's opportunities for compensation and advancement remained stable after the Department hired the interns.  She was not, for instance, moved from a "career ladder position," where she would have been eligible for two-grade promotions, to a non-career ladder position, where she would only be eligible for promotions one grade at a time.  Defs.' Ex. A at 2 ¶ 10.  And Sharp's position as a Budget Technician never entailed any supervisory responsibilities.  SMF ¶¶ 19–37.

More, the Secretary has come forward with legitimate, nondiscriminatory reasons for reassigning some of Sharp's tasks to interns.  For one thing, the Department redistributed some of her workload only after she "refused to perform all of her job responsibilities."  SMF ¶ 34.  For another, Sharp herself *asked* the Department to reassign some of her repetitive tasks to

interns after she had surgery on one of her wrists, a request the Department obliged. *Id.* ¶¶ 149–50. Given these explanations, the Court finds the Secretary has met his burden to produce "legitimate reason[s] for the challenged action," and it concludes Sharp lacks sufficient evidence to show his reasons are pretext for intentional discrimination. *Iyoha*, 927 F.3d at 566.

*Sixth*, Sharp contends the Secretary retaliated against her by denying her request for light work duties necessitated by her wrist surgery and other ongoing injuries. *See* Compl. 24 ¶¶ 18, 20; *id.* at 25 ¶ 23; *id.* at 26 ¶ 28. But these allegations find no footing in fact. The undisputed record shows Sharp emailed her supervisors and McDowell saying that her surgeon prohibited her from using her left hand and wrist for two weeks. SMF ¶ 149. But she clarified in that same email that "she was not immediately requesting any reasonable accommodation." *Id.* A week later, she emailed again asking that the interns "prepare allotments for [her] in a certain way—pre stapled, hole-punched, and not placed in a folder—to minimize the use and weight of material she would have to handle throughout the day." *Id.* ¶ 150. The Department then granted this request and assigned interns Sharp's repetitive tasks "from the time when [she] first notified [her supervisor] until her resignation." *Id.* ¶ 154. Again, no reasonable employee would view this as "materially adverse" conduct. *Congress*, 514 F. Supp. 3d at 18.

*Seventh*, Sharp claims Wohlever said, "I hear voices in my head" in a staff meeting in December 2017. Compl. 20 ¶ 25. She interpreted the comment as a "prejudicial stereotype meant to stigmatize people with a mental condition." *Id.* But Wohlever knew nothing about Sharp's disability until months later. SMF ¶ 15. Nor did he ever perceive Sharp as having a disability. *Id.* ¶ 16. "The fact that the allegedly retaliatory actions preceded" Wohlever's knowledge of "the protected activity precludes a determination that the protected activity caused

[Wohlever] to retaliate against [Sharp]." *Lewis v. District of Columbia*, 653 F. Supp. 2d 64, 79 (D.D.C. 2009).

*   *   *

The parties do not dispute any factual issues material to Sharp's retaliation claims.  And based on the undisputed facts, the Secretary is entitled to judgment as a matter of law.  So the Court will award summary judgment to the Secretary on Counts IV and V.

**B.**

Now for Sharp's hostile work environment claim (Count I).  At the outset, the Court notes that the Complaint offers thin factual support and no legal authority for this claim.  As for the facts, this is it: "From September 2015 to July 2018, the Plaintiff was subjected to disparate treatment in the terms and conditions of her employment, which led to intolerable work conditions."  Compl. 2.  And as for the law, Sharp fails to identify an applicable statute.  *See id.*

Like the retaliation claims, Sharp cannot expect the Court to intuit the source of law behind her hostile work environment claim.  *See Jarrell*, 656 F. Supp. at 239 (stating *pro se* plaintiffs cannot "expect the Court to decide what claims a plaintiff may or may not want to assert").  But only one federal law mentioned in the Complaint—the Rehabilitation Act—can support this theory of liability, so the Court proceeds under that statute.  *See Webster v. U.S. Dep't of Energy*, 267 F. Supp. 3d 246, 259 (D.D.C. 2017) ("The Rehabilitation Act encompasses . . . hostile work environment claims.").

To succeed on her hostile work environment claim under the Rehabilitation Act, Sharp must prove "that [her] employer subjected [her] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.'"  *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C.

23

Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see also Brett*, 404 F. Supp. 3d at 66 (applying this standard under the Rehabilitation Act). Severity or pervasiveness is critical, so Sharp must either "set forth facts showing that 'a single episode is severe enough to establish a hostile working environment,'" or prove "a connected series of incidents that are 'sufficiently continuous and concerted to be considered pervasive.'" *Aldrich*, 197 F. Supp. 3d at 136 (quoting *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999)).

The Court determines the presence of these elements by looking to "'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Baird v. Gotbaum*, 792 F.3d 166, 169 (D.C. Cir. 2015) (quoting *Harris*, 510 U.S. at 23). This is a totalities-of-the-circumstances test. *Brett*, 404 F. Supp. 3d at 66. And courts are traditionally skeptical of attempts to "regurgitate" retaliation claims as a hostile work environment claim. *Id.*

Sharp emphasizes pervasiveness over severity, arguing that several incidents, which occurred over a three-year span, together reach the level of actionable discriminatory hostility. *See* Compl. 2 ¶ 1; Pl.'s Mem. 5. For factual support, Sharp draws on all the incidents previously analyzed for her retaliation claims, plus six more: (1) her delayed desk phone; (2) her nonworking LincPass; (3) errors made by her co-workers; (4) miscellaneous annoyances by her co-workers; (5) a sudden increase in filing tasks; and (6) the fact that she requested light duty and her supervisor reassigned some of her tasks to interns. Viewing "all the circumstances" together, the Court concludes the Secretary did not subject her to a hostile work environment based on her disability. *Baird*, 792 F.3d at 169. Even so, the Court examines each new set of facts Sharp identifies in support of this claim.

Immediately, Sharp's new incidents meet trouble. The first four—the delayed desk phone, nonworking LincPass, co-worker errors, and miscellaneous co-worker annoyances—all occurred before anyone at the Department knew Sharp had a disability or perceived her as having a disability. The undisputed facts show that no one knew of Sharp's disability until she initiated EEO proceedings on November 17, 2016. SMF ¶¶ 11–16. Sharp received her desk phone by March 2016. *Id.* ¶ 41. Her LincPass was fixed that same month. *Id.* ¶ 47. The Department remedied Sharp's reports of misfiled folders in May 2016. SMF ¶ 50–51; Defs.' Ex. H at 26–29, ECF No. 68-11. In November 2015, the Department professionally addressed Sharp's perception of hostility from Parker after Sharp corrected one of her allotment uploads to SharePoint. SMF ¶¶ 66–70; Defs.' Ex. E at 3. And the petty annoyances by Sharp's co-workers also occurred before anyone knew of her disability: she found syrup in her chair in May 2016, and things went missing from her desk in September 2016 (a frustration shared by other co-workers). Defs.' Ex. E at 4; SMF ¶ 71. In sum, timing alone disqualifies these incidents from supporting Sharp's claim of a "*discriminatorily* hostile or abusive environment." *Harris*, 510 U.S. at 21 (emphasis added); *see also Buie v. Berrien*, 85 F. Supp. 3d 161, 182 (D.D.C. 2015) ("Where the evidence offered by a plaintiff 'bears no connection' to her protected class, it 'cannot support . . . a hostile work environment claim.'" (citation omitted)).

So two instances remain: the increase in filing and organizing tasks that Sharp had to perform, and the Department's use of interns to lighten Sharp's workload. *See* Pl.'s Mem. 9–14. The Secretary set the record straight on both allegations. Sharp's filing and organizing tasks, which were always part of a Budget Technician's job, increased and decreased depending on the time of year and the analysts' need to access allotment folders. SMF ¶¶ 19–20, 25–26. And while Sharp alleges the Secretary denied her light duty request following a surgery, undisputed

record evidence shows that Gutridge immediately reassigned her repetitive tasks to interns—just as Sharp had requested.  SMF ¶ 165.  These are slender reeds indeed for Sharp's claim.

Viewing these incidents as a whole, including the incidents Sharp marshalled in support of her retaliation claims, they "simply do not reveal a pattern of behavior that is either sufficiently severe or pervasive to support a conclusion that [the Secretary] subjected [Sharp] to 'discriminatory intimidation, ridicule, and insult that . . . alter[ed] the conditions of [her] employment and create[d] an abusive working environment.'"  *Aldrich*, 197 F. Supp. 3d at 137 (quoting *Baloch*, 550 F.3d at 1201).  So the Court will grant summary judgment to the Secretary on Sharp's hostile work environment claim.

## C.

This leaves Sharp's final claim, constructive discharge (Count VII).  Once more, Sharp has not tethered her constructive discharge claim to a particular federal law.  So again, the Court assumes she asserts this claim under the Rehabilitation Act because it is the only statute mentioned in the Complaint that could support such a claim.

To state a claim for constructive discharge under the Rehabilitation Act, Sharp must show that "(1) intentional discrimination existed, (2) the employer deliberately made working conditions intolerable, and (3) aggravating factors justified the plaintiff's conclusion that she had no option but to end her employment."  *Rosell v. Kelliher*, 468 F. Supp. 2d 39, 50 (D.D.C. 2006) (citation omitted).  "Satisfaction of this test requires 'an aggravated case of . . . a hostile working environment.'"  *Harris v. Wackenhut Servs., Inc.*, 590 F. Supp. 2d 54, 81 (D.D.C. 2018) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 154 (2004)); *Steele v. Schafer*, 535 F.3d 689, 694 (D.C. Cir. 2008) (recognizing that "the facts necessary to prove a hostile work environment are a subset of those necessary to prove" a "constructive discharge claim premised on a hostile work

environment").  In other words, a plaintiff can succeed on a constructive discharge claim only if she can successfully prove the existence of a hostile work environment.

This logic alone condemns Sharp's claim for constructive discharge.  As explained above, her work environment was not hostile, so she cannot prove "aggravated" hostility. *Harris*, 590 F. Supp. 2d at 81.  More, Sharp's list of incidents chronicles "ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998) (citation omitted). Conspicuously missing are "[a]ggravating factors" of the sort necessary to support a claim for constructive discharge—factors that "mak[e] the workplace so disagreeable" that they "prevent the employee from seeking remediation on the job." *Veitch v. England*, 471 F.3d 124, 130 (D.C. Cir. 2006) (citation omitted).  Sharp repeatedly sought remediation on the job.  And the Secretary repeatedly obliged her.  The Court will therefore grant summary judgment to the Secretary on Sharp's constructive discharge claim.

## IV.

Based on the undisputed facts and controlling law, the Court concludes that the Secretary is entitled to summary judgment on all of Sharp's remaining claims.  A corresponding order shall issue today.

Dated:  November 3, 2023                              _____
                                                                      TREVOR N. McFADDEN, U.S.D.J.